# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CHARLES WILLIAMS,**

    **Plaintiff,**

v.

**WARDEN RICK CHUVALAS,** *et al.*,

    **Defendants.**

Case No. 2:16-cv-33
Judge George C. Smith
Magistrate Judge Chelsey M. Vascura

## REPORT AND RECOMMENDATION

Plaintiff, Charles Williams, a state inmate proceeding without the assistance of counsel, brought this action under 42 U.S.C. § 1983, alleging that Defendants Warden Rick Chuvalas and Major George Smith violated his First Amendment rights by establishing a religion. (ECF No. 6.) This matter is before the United States Magistrate Judge for a Report and Recommendation of Defendants' Motion for Summary Judgment. (ECF No. 20.) For the reasons set for below, it is **RECOMMENDED** that the Defendants' Motion for Summary Judgment be **GRANTED**.

### I.

According to Plaintiff's Complaint, the alleged Establishment Clause violation occurred while Plaintiff was temporarily housed at the Correctional Reception Center ("CRC") in Orient, Ohio. (Compl. 1, ECF No. 6.) Plaintiff alleges on July 18, 2015, the Bill Glass "Behind the Walls" event permitted by CRC established religion in violation of his First Amendment rights because he was forced to hear a Christian inmate band play and Christian preaching by the Bill Glass speaker. (*Id.* at 2.) The Bill Glass event was hosted outside in the prison's recreation yard. According to Plaintiff, the event was mandatory, and when he tried to walk away from the event,

Defendant Major George Smith ordered him "to go stand in the crowd" even though he told Defendant Smith he is a Muslim. (*Id.*) Plaintiff also complains he was forced to hear preaching afterwards at lunch because the Bill Glass members stayed and talked with the inmates while they ate. *Id.*

Defendants contend that the primary purpose of the Bill Glass event was for entertainment, not for religious preaching. (Mot. for Summ. J. 3, ECF No. 20.) According to Defendants, a juggler performed and told jokes, and at the end shared his "personal story" and asked if any of the inmates wanted to learn more about Christianity. (*Id.* at 4.) If any inmates did want to learn more, they were able to meet privately in smaller groups with Bill Glass volunteers, but no inmates were forced to be part of those conversations. (*Id.*) Defendants also point out that the inmate band that typically performs at CRC's chapel services played a variety music such as Johnny Cash songs. (*Id.* at 3.) Defendants do not refute that the event was mandatory, but assert that because CRC is a level-three prison, for safety and security reasons, all inmates are escorted together to food service and recreation. (*Id.* at 3.) According to Defendants, Defendant Smith found Plaintiff doing "calisthenics" on the track and told him to stop causing disruptions. (*Id.* at 4.) Defendant Smith represents that he allowed Plaintiff to stay on the baseball bench, which was about 150 yards away from the Bill Glass event, for the remainder of the event. Defendants therefore posit that Plaintiff was not required to participate in the event. (*Id.*)

Prior to filing his Complaint, Plaintiff filed a grievance on July 20, 2015, against the Warden with the Chief Inspector of the Ohio Department of Rehabilitation and Corrections regarding the Bill Glass event, and his grievance was granted. (Compl. 4–5, ECF No. 2.) He also filed an informal complaint against Major Smith on July 18, 2015, but alleged he never

2

received a response for that grievance. *Id.* Defendants however, attached the informal complaint resolution response, which reflects that Plaintiff's informal complaint was answered. (Defs.' Ex. D, at 9, ECF No. 20-1.)

Plaintiff filed his Complaint on March 1, 2016, seeking compensatory and punitive damages against both Warden Chuvalas and Major Smith. (Compl. 4–5, ECF No. 2.) Defendants filed their Motion for Summary Judgment on May 4, 2017. (ECF No. 20.) On June 8, 2017, the Court issued an Order advising Plaintiff to "file an opposing memorandum, if any, within fourteen days of the date of this order. Failure to do so may result either in the motion being treated as unopposed, or in dismissal of this action for failure to prosecute." (June 8, 2017 Order, ECF No. 21.) To date, Plaintiff has failed to file a response to Defendants' Motion for Summary Judgment.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion"). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Id*. at 255 (citation omitted). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

Here, Defendants filed their Motion for Summary Judgment on May 4, 2017. (ECF No. 20.) Plaintiff was ordered on June 8, 2017, to file a response within fourteen days of the Order, but failed to respond. (ECF No. 21.) Defendants' Motion for Summary Judgment will therefore be treated as unopposed.

### III.

As a preliminary matter, the undersigned finds that Plaintiff's failure to respond to Defendants' Motion for Summary Judgment amounts to an abandonment of his claims against them. *See Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (affirming trial court's finding that a party's failure to properly respond to the arguments raised in a motion for summary judgment constituted an abandonment of those claims); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because [the plaintiff] failed to address it in either his response to the summary judgment motion or his response to [the defendant's] reply brief); *Conner v. Hardee's*

*Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003) (finding that the plaintiff's failure to brief issues relating to one of its claims in the district court amounted to an abandonment of that claim). The undersigned further finds that Defendants are entitled to summary judgment because the Defendants have met their burden by demonstrating no genuine dispute of material fact exists.

**A.	Exhaustion**

Defendants argue that Plaintiff's claim against Defendant Smith should be dismissed because Plaintiff failed to exhaust his administrative remedies. The undersigned finds that Defendant Smith has satisfied his burden to show that Plaintiff failed to exhaust his administrative remedies.

Under 42 U.S.C. § 1997e(a), as amended by the PLRA, "a prisoner confined in any jail, prison, or other correctional facility" may not bring an action challenging "prison conditions" under 42 U.S.C. § 1983 "or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (citation omitted)). This mandatory exhaustion requirement applies to all lawsuits relating to prison conditions, regardless of the nature of the wrong or the relief sought. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "Exhaustion" under the PLRA means "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). To properly exhaust, prisoners must "tak[e] advantage of each step the prison holds out for resolving the claim internally and . . . follow the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey*

*v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010); *Jones*, 549 U.S. at 217–18 (noting that proper exhaustion requires "[c]ompliance with prison grievance procedures").

Proper exhaustion is "defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218. Ohio's Administrative code establishes a three-step grievance process for inmates before they have properly exhausted their complaint. OHIO ADMIN. CODE 5120-9-31(K). First, the inmate must file an informal complaint within fourteen days after the event occurs to the direct supervisor or relevant department specifically describing the event giving rise to the complaint. *Id.* at 5120-9-31(K)(1). The second step if the inmate is dissatisfied with the informal complaint response from the prison staff is for the inmate to file a notification of grievance with the inspector of institutional services within fourteen days after the response. *Id.* at 5120-9-31(K)(2). Finally, the third step before an inmate has exhausted his administrative remedies is to file an appeal to the office of the chief inspector within fourteen days after the inspector of institutional services response. *Id.* at 5120-9-31(K)(3). The chief inspector's decision is final, and once the inmate receives a response, he has exhausted the prison grievance process. *Id.*

"A prisoner's failure to exhaust his intra-prison administrative remedies prior to filing suit 'is an affirmative defense under the PLRA . . . .'" *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones*, 549 U.S. at 216). Defendants bear the burden of proof on the affirmative defense of exhaustion. *Napier v. Laurel Cty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) (citations omitted) ("[F]ailure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants."). "Summary judgment is appropriate only if defendants establish the absence of a genuine dispute as to any material fact regarding non-exhaustion." *Surles*, 678 F.3d at 455. "When a prisoner's complaint contains a

combination of exhausted and unexhausted claims, courts are to dismiss the unexhausted claims but retain and address the exhausted claims." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 500 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 220–24).

Applying the foregoing authority, Defendant Smith has met his burden of proving that Plaintiff failed to exhaust his administrative remedies. As set forth above, Plaintiff was required to "properly exhaust" his claims, which in part required him to follow the procedural rules set forth in the ODRC's grievance process. *See Reed-Bey*, 603 F.3d at 324. Specifically, Defendants have provided uncontroverted evidence that Plaintiff's informal grievance request on July 18, 2015, was answered by a staff member on July 22, 2015. (*See* Defs.' Ex. D, at 9, ECF No. 20-1.) Pursuant to step two of Ohio's grievance procedure, Plaintiff had fourteen days from the July 22, 2015 response to file his notification of grievance. Ohio Admin. Code § 5120-9-31(K)(2). Plaintiff failed, however, to file his notification of grievance and thus failed to exhaust his administrative remedies with regard to Defendant Major Smith.

Accordingly, it is **RECOMMENDED** that Plaintiff's claims against Defendant Smith be **DISMISSED WITHOUT PREJUDICE** for failure to comply with the PLRA's exhaustion requirements.

**B.     Establishment Clause**

For there to be a constitutional violation under 42 U.S.C. § 1983, there must have been state action by a person acting under the color of state law. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Here, the Deputy Warden, Karrie Hupka, assisted in planning the Bill Glass event, the event was held in the CRC's recreation yard, and Defendant Warden Chuvalas does not dispute that hosting the Bill Glass event was state action. (Decl. Ex. A, at 7, ECF No.

7

20-1.)  Thus, the evidence demonstrates Defendant Warden Chuvalas was acting under color of law when he permitted the Bill Glass event to occur.

Nevertheless, the undersigned conclude that the uncontroverted evidence submitted by Defendants reflect that they are entitled to summary judgment on Plaintiff's on Plaintiff's Establishment Clause violation claim.

"The touchstone for our analysis is the principle that the The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (internal quotation marks omitted).  The most widely adopted test for determining an Establishment Clause violation by a state actor is the *Lemon* test, under which the state actor must demonstrate that their practice (1) reflects a secular purpose, (2) has a primary purpose or effect must that neither advances nor inhibits religion, and (3) does not foster "an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971); *cf. ACLU of Ky. v. Mercer Cty., Ky.*, 432 F.3d 624, 635–36 (6th Cir. 2005) (while expressing doubt over the viability of the *Lemon* test, the Sixth Circuit held it still applied to current Establishment Clause cases).  The government must satisfy all three prongs of the *Lemon* test.  *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 431 (6th Cir. 2011).

### 1. Primary Purpose

"In determining the government's purpose . . . a [government actor's] stated reasons will generally get deference."  *DeWeese*, 633 F.3d at 431.  The government's purpose "has to be genuine, not a sham, and not merely secondary to a religious objective."  *Id.*  However, the purpose does not have to be exclusively secular, and can include religious components as long as

the activity was not "motivated wholly by religious considerations." *See Lynch v. Donnelly*, 465 U.S. at 680–81 (1984).

Here, according to the uncontroverted evidence Defendants submitted, the Bill Glass "BEHIND THE WALLS" event was structured around the primary purpose of providing free entertainment to the inmates, with a religious component that was voluntary. (Decl. Ex. A, at 7,10, ECF No. 20-1.) At the event which gave rise to this case, a "Bill Glass volunteer juggled bowling pins and told jokes" for about thirty minutes. (*Id.* at 10.) After the entertainment portion, the juggler "shared his personal story and asked if any of the inmates wanted to learn about Christianity." (*Id.*) Any inmate who wanted to learn more could join a small group and talk privately with other Bill Glass volunteers. The conversations, however, were voluntary, and "Plaintiff was not required to participate[.]" (*Id.*) In addition, even though the event had religious components to it, "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Van Orden v. Perry*, 545 U.S. 677, 690 (2005). The undersigned finds that the uncontroverted evidence Defendants presented reflects that the event was primarily for the secular purpose of entertainment.

### 2. Primary Effect

In the Sixth Circuit, the "endorsement test" is used to clarify the second prong of the *Lemon* test. *See Smith v. Jefferson Cty. Bd. of Sch. Com'rs*, 788 F.3d 580, 587 (6th Cir. 2015). Under the "endorsement test," the Court must first determine if the state's actions were coercive. *Id.* at 589. "[T]he state endorses religion when it coerces participation in a religious activity. Coercion not only includes securing participation through rules and threats of punishment, but also includes imposing public pressure, or peer pressure, on individuals." *Id.* If the Court finds there was no endorsement, the Court must then look to whether "a reasonable observer would

9

think that the activity is a governmental endorsement of religion." *Id.* at 590 (citing *Capital Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment)).

Here, even though the event was mandatory for all inmates to attend, the record reflects that the purpose for nearly all of the mandatory portion of the event was entertainment; the band played a variety of songs, and any religious component was reserved for a brief period at the end of the event. (Decl. Ex. A, at 7, ECF No. 20-1.) Additionally, Defendant Smith's declaration reveals that Plaintiff was permitted to sit on a baseball bench about 150 yards away from the event. (Decl. Ex. C, at 7, ECF No. 20-1.)

Further, a review of the record reveals that purpose of requiring inmates' attendance was not to infringe on Plaintiff's First Amendment rights or coerce him into converting to Christianity, but rather for safety and security reasons. As Defendants explain, CRC is a level-three prison and because of this status "all inmates except cadre inmates are escorted together to food service and recreation." (Decl. Ex. C, at 7, ECF No. 20-1.) It is widely recognized that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.") Thus, to the extent the event had religious components, the undersigned finds the mandatory nature was necessary due to safety and security concerns.

Finally, while coercion can be established by public or peer-pressure, that argument is not convincing in this case because all of the inmates were adults, and they were not forced to

participate in the small-group activities. *Cf. Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").

Upon finding no coercion, the Court must also determine "whether or not a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government." *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004). The government's actions are evaluated in context and objectively under a reasonable person standard. *ACLU of Ky.*, 432 F.3d at 636–67; *Smith*, 788 F.3d at 590 (finding no endorsement when religious references only *de minimus* interactions with a religious institution).

Here, a reasonable observer is deemed to have knowledge about the context and history of the actions. Based on the record evidence, a reasonable observer would take into account the context of the event, and they would recognize that the mandatory nature was due to prison safety concerns. *See Pell*, 417 U.S. at 822. Further, a reasonable observer, after seeing the event, would most likely conclude the event was for secular purposes and not to force a certain religious belief on the inmates. (*See* Decl. Ex. A, at 7, ECF No. 20-1.) Once again, Plaintiff has supplied no evidence to the contrary. In sum, the evidence provided by Defendants reflects that a reasonable person, observing the context in the entirety, would find that the event was not an endorsement of religion by the state.

### 3. Excessive Entanglement

Under *Lemon*'s third prong, a Court must look at "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon*, 403 U.S. at 615. Entanglement can also arise when the relationship is "comprehensive, discriminating, and

11

continuing state surveillance[.]" *Smith*, 788 F.3d at 593-95 (quoting *Lemon*, 403 U.S. at 625) (for example, money exchanges between the government and the religious entity, state delegation of power to the religious entity, or providing aid to religious entities all constituted Establishment Clause violations).

Here, there exists no excessive entanglement between the state and religion. This was a one-time, temporal event held on July 17-18, 2015. (Decl. Ex. A, at 7, ECF No. 20-1.) CRC did not pay any money to Bill Glass for the event. (*Id.*) The Bill Glass volunteers were not given any control over the inmates nor delegated any duties traditionally held by the state or prison officials. In short, nothing in the record suggests entanglement, let alone excessive entanglement. Thus, the third prong of *Lemon* is satisfied.

In sum, Defendants have established that no genuine dispute as to any material fact remains such that they are entitled to judgment as a matter of law. Consequently, it is unnecessary to consider Defendants' alternative bases in favor of summary judgment. Accordingly, the undersigned hereby **RECOMMENDS** judgment in Defendant Warden Chuvalis' favor be entered.

### IV.

For the foregoing reasons, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment (ECF No. 20) be **GRANTED** such that Plaintiff's claim against Defendant Smith be **DISMISSED WITHOUT PREJUDICE** for failure to comply with the PLRA's exhaustion requirements, and judgment be awarded against Plaintiff and in favor of Defendant Warden Chuvalas with respect to the claim Plaintiff brought against Defendant Warden Chuvalas.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

 s/ *Chelsey M. Vascura*  
CHELSEY M. VASCURA  
UNITED STATES MAGISTRATE JUDGE